I think the microphone is very sensitive, so you don't have to put it right up against your mouth like a singer would. Well, we can hear you just fine with the microphone where it is. Okay. Thank you very much. This action was started in 2003 and has been going on for about seven years. We've had hundreds of papers back and forth and with all these documents over seven years, the district court did not deem itself, did not find a single fact to go to the jury. Now, to one who was uninitiated in the law, it would appear, it could appear, that the district court treated this as a frivolous case, which of course it is not, and the court did not. Anyway, that was just my opinion. But we feel that the district court made several mistakes. In connection with the utility patent, 112 equivalency is a question of fact for the jury, yet the district court said that there was no fact for the jury to decide. The equivalency in this case, on the 112 equivalency, is that both knives achieved the same results in the same manner with substantially the same equipment. Now, both knives are directed to a removable blade, which can be removed without any tools.  had the ability to remove the blade. They had this idea and patented it. Both knives... The district court, on that point, as I recall, the district court thought, was this the one where the only evidence supplied was from Mr. Mishkin, and that he thought the expert testimony was insufficient or inapt for the issue before them? Am I right about that? No, Your Honor. The district court disagreed with the experts. It didn't say that the experts was wrong. It disagreed with the experts' conclusions. Which I think is a question of fact, which a jury should decide. Anyway, both knives use a blade lock means for unlocking and locking the blade. Both use some sort of a lever, and both knives fold the knife into the handle so that no one gets hurt. Now, in this case, in this event, both knives are equivalent to each other. I'm not talking about identical equivalents. I'm talking about substantial equivalents so that so that the court could have held that both knives were equivalent under the 112 equivalency doctrine. You're talking about the infringement issue at this point? I'm sorry, sir? You're talking about the infringement question? Yes, the infringement. 112 infringement of the utility patent right now. Right. This is a very crowded art field, isn't it? I'm sorry, sir? This is a very crowded art field, so little distinctions become significant? Yes, I think they made a mistake. The court made a mistake in assuming that equivalency was structural equivalency, not 112 equivalency. Okay. Now, as the court knows, structural equivalency does not require... I'm sorry. Structural... I'm sorry. Structural equivalency does not require structural identity. Now, with respect to the design patents, seven design patents, the law says, even though there is a new regime in Egypt, the Egyptian goddess case still rules in this court, I believe. And the court... and that... design infringement is a question of fact. Now, the court, the district court, paid lip service to Egyptian goddess, but never in this decision did it compare the entire overall appearance of the patents, the design patents, with the overall appearance of the infringing patent. I think the district court should have... Instead, the district court got involved with details, how many screws here and what the shape of an opening, but these are not what the Egyptian goddess wants. The Egyptian goddess wants someone to look at this design and that design and say, are these similar to each other? And I don't think the court applied that rule. In connection with the trade dress... Well, the similarity in... that was referred to in Egyptian goddess depends, it seems to me, on the prior art. Yes. So you have to look at the accused device and the patent and their similarity in light of all the prior art. And what struck me about this case is that some of the prior art is pretty close and that therefore, perhaps in this context, smaller differences between the accused device and the patented... or the accused device and the patented design might be more conspicuous. But, Your Honor, the court did not say this prior art is so close to the patented items that little differences make a difference. It didn't say that. It didn't... Do they need to say that? And this goes back to my earlier comment about it being a crowded art field. Does the court need to say that these little differences make a difference? Isn't that understood when you're looking at designs in this context? Well, the court did not indicate any prior art which says this is the dominant prior art that is so close to the patents that these differences are going to make a difference. It didn't say that. There's no prior art that the court cited that it felt was the starting point of our designs. Okay. And on the trade dress, the court held that it was functional and yet or the only reason it held that is that it compared our trade dress with the elements in the utility patent. And now the utility patent, none of the elements of the utility patent claims are part of the trade dress. The trade dress is only concerned with the shape, positioning, and the size of the various aspects of the trade dress. None of the elements in the claims in the utility patent, which the sister court based a lot of its opinion on, are in the design patents. Therefore, I think the court heard in all these matters. Okay, very well. We'll hear from your opposing counsel. Let's see. I guess we're having two arguments from opposing counsel today. Is that correct? With the court's permission, your honor. All right, and you are Mr. Richardson? No, your honor, Mr. Graham. Mr. Graham. Yes, your honor. With the court's permission, I missed it. Mr. Graham, you're taking five minutes. Is that right? Your honor, I would like to take up to five minutes to address solely the design patent issues. Mr. Richardson, with the court's permission, would address the balance of the case. In addressing the issues of Mr. Provito, if I may, first, there is an initial argument that the district court below erred in not evaluating the overall appearance of the knives. And I think that, you know, the court obviously did that. The trouble in any argument on appeal dealing with the design patent with that question is that, of course, the court below can't articulate the overall difference without saying something that they're just different. And as soon as the court goes to the next level... explaining why you think they're different on an overall level, you raise the issue that can be ripe for appeal, saying, ah, you're looking at individual features, not the overall. You have to write the opinion at that level, and that's what the court below did. The other issue that's generally raised is that the court didn't identify dominant prior art or was asking the plaintiff to look at all of the prior art rather than some subset or the closest prior art or something of that sort. Our reading of Egyptian goddess is that the perspective of the ordinary observer is one who is familiar with the prior art. There's nothing in there about subsets or closest or anything of the sort. It's all hypothetical ordinary observer, not an actual live person where you present to the court what a live person would or would not have been aware of. Egyptian goddess also calls upon the defendant to be responsible for finding that prior art and bringing it before the court, and that's what we did. We certainly didn't thrust all of the prior art on the globe in front of the court. We chose what we thought was, in fact, the closest prior art. And in the proceedings below, Great Neck simply did not articulate what Egyptian goddess requires them to do, which is to analyze the similarities of the patents and the accused product from that vantage point, from the perspective of that person who's familiar with the prior art. Instead, they simply articulated the proposition that the accused and the designs are similar. But without that perspective, you cannot begin to meet your burden and you cannot demonstrate the existence of a genuine issue of fact. Let me just ask you a side question on that point. I mean, I know there are a lot of patents around here and a number of issues. What took seven years? Why did this case ultimately went down on summary judgment, no jury trial? Why did it take so long? What took so long? I might have to defer that question partly to Mr. Richardson, who was in it longer. I do know that there were some jurisdictional issues between filings in New York and in Seattle. There was a stay of the case during Egyptian goddess waiting for that opinion that accounted for a chunk of it. I think those two issues are the bulk of it. To get down to the know-it when I see it, if you could look at pages 56 and 57 of the blue brief, if you have that available to you. Those are the pages in which the 250 patent is lined up against the accused knife. And the 895 patent is also lined up against the accused knife. Those look pretty similar to the untutored eye. And the question is, point us, if you would, to prior art that when viewed in the context of the comparison between the accused device and the claimed designs would emphasize or call out or otherwise teach us that the accused device is not equivalent to the accused, to the claim design. Surely, your honor. And I think what the district court below did in categorizing the patents is very helpful here. It broke them into three groups. And the two that the court is directing us to now is the group of two sets of claims, two patents, wherein the claim only is directed to the handle and puts everything else in phantom. And that leaves very few details for there to be in the patent at all. And so the closest art that would be compared, that we identified below, were the Victorinox and the Conacher prior art references, both of which have handles that have... And these are the two that are on page 23 of the court's opinion on the right-hand side? The court has five diagrams and these would be the two on the right? Yes, your honor. That's correct. Both of those essentially have a straight top of the handle. One of them has the indentation at the back edge of the rear top of the handle. And they both have a number of scallops, either two or four. So the court's conclusion was that one of those was nearly identical to these two patents that were shown here. The court literally used that word in comparing the prior art to these two claims. And the number of scallops then became a very important issue, considering that so many other knives, at least these two to be fair, had a number of scallops. So those would be the two. You agree with the court that those are the two that would be most pertinent at least to these comparisons? Among what we presented, absolutely not. That's true. Now, if you have anything else, you'll want to get to it. No, your honor. I'll yield my time. Very good. Now I think, by process of elimination, I think you're Mr. Richards. You had a hundred percent chance on that. No, I didn't, because I could have forgotten that that was Mr. Brown. Okay. The clock will tell you that you have nine minutes and 35 seconds, assuming this clock and that one agree. Maybe they don't agree. If so, it's the influence of this court. May it please the court, I'm going to address the issues of utility patent infringement, the Grayneck utility patent, and their claim of trade dress infringement. I want to start out with a very brief summary, so you'll see where we're going. If you find the blade holding means and or the blade lock means limitations of claim 26 to be subject to section 112-6, then you should find that the Starasia Titanite does not infringe any of the claims at issue. Well, it seems to me the only, the major hurdle one has in a case such as this is not who ultimately wins and loses, but how you get around summary judgment. Because generally, means plus function claims and identifying the structure and the function and whether they're equivalent and so forth, seems like a high, as opposing counsel suggested, seems like a very fact specific inquiry and here they did have some expert testimony on those questions, did they not? They did. And so, how do you overcome the argument at least that there were factual disputes that were resolved by the district court here on summary judgment? As, as the, uh, the, uh, expert reports here are, um, uh, the court concluded, and we think correctly, that the experts did not apply the proper law. When you say experts, now, let me make sure. I had thought that Mr. Miskin was the only expert whose report was in play here, uh, on the plaintiff's side. Am, am I missing a report that's pertinent on this question? No, that was the, that was the only expert that the, that the plaintiffs offered. Okay, so when you say experts report missed something, you mean Mr. Miskin? Mr. Miskin, I was, I was also referring to the, we had an expert as well. Right, all right, but, but we're, what we, our focus is entirely on Mr. Miskin's report, right? And that is the report, just to make sure that I have whatever it is that is all that we need to look at here. That's the report that starts on page 3355 and runs to page 3369 of the joint appendix. The pages, I'm not sure about, Your Honor, but Mr. Miskin was the only expert the defendants offered. Well, okay, I'm going to assume that's, that's the pertinent report. Go ahead. He only had one report. He only had one report. Okay. Go ahead. Um, as to Mr. Miskin's report, uh, our position is that, uh, as to, as to infringement, would you like me to discuss all the issues that, that, that could have come up, uh, that, where there could have been factual issues or just... Well, pursuant to, to Judge Prost's question, which I, I, I, endorse, uh, could you address the question of why it is that Mr. Miskin's statements about equivalence are not sufficient to justify a trial in this case? Uh, according to the court, uh, and, and we agree, uh, Mr. Miskin's problem was that he, he, he wrongly addressed the, the, uh, the, uh, infringement issue in connection with the utility patent. He totally overlooked the possibility that there could have been literal infringement, and he jumped immediately over onto the issue of, uh, doctrine of equivalence, which we believe is not applicable in this case. And the judge concluded that his, that his report as a whole was simply not reliable. When you say the doctrine of equivalence isn't applicable in this case, are you, are you saying that what's at issue by virtue of the judge's claim construction of the means plus function claims, what's at issue is whether there was identical or equivalent structure disclosed in the specification, but not the more conventional doctrine of equivalence? Well, as you, as you stated, we've got two, we've got two places in this analysis where equivalence enters the picture. One is under 112 literal infringement, and the other is the possibility of doctrine of equivalence. Right. Uh, the standards are slightly different. Yeah. And, uh, no, no, rephrase your question, please. Let me, let me. Well, I'm trying to see if when you say equivalence were not an issue in this case, whether you're saying that the traditional doctrine of equivalence was not pleaded and just wasn't an issue, or whether you're saying that the, um, equivalence analysis of Mr. Miskin did not apply to the question of equivalence under 112-6. You follow me? Yes, that's, that's, he, he didn't, he didn't recognize, uh, that, uh, under literal infringement of, of, uh, means plus function claims, um, uh, you, you got the possibility of, of, uh, of, uh, equivalence. You have to consider equivalence. Uh, the, the, the test for equivalence under 112-6 is, is, is one thing. Uh, but then if, if literal, if traditionally in patent infringement cases, if literal infringement doesn't apply, then you have to also consider the doctrine of equivalence. Which Mr. Miskin did. He did. But, uh, the court pointed out, uh, from the Odetics case that in a, in a, in a situation where you have, or the accused product is, is really a, a pre-existing, is pre-existing technology, that is pre-existing the date of issuance of the patent in question, uh, the doctrine of equivalence, the traditional doctrine of equivalence, is not applicable. It only applies to after, uh, after occurring technology. Let me see if I can ask this just a little bit differently. Given the court's claim construction that this was a means plus function claim, a lock, blade lock issue, and so on, your argument, or the court's understanding, is that the expert didn't recognize that the equivalence issue was a subset of means plus function, but instead dealt with it as if it was a straight infringement with doctrine of equivalence. That, that appears to be what he did. Is that your argument? That's, that's my argument as far as equivalence goes, and why the, why his, uh, why the court, uh, disregarded his, his report on the issue of equivalence. Arguing, uh, under the view that the two types of equivalence are not equivalent. No, they're not. They're not, well, they're not exactly the same. They're, they're different. Now, you said earlier, I think, that odetics deals with the traditional doctrine of equivalence as opposed to 112.6. I believe it's, I believe it's the opposite. I think odetics deals with 112.6. It does, it does. So what's the answer to the traditional doctrine of equivalence, which Mr. Miskin referred to in his, but why isn't there an issue with respect to that question? Because, you know, because it's been held, and, and odetics is an example, that the doctrine of equivalence is not applicable if the accused product is pre-existing technology. I think that that ruling, I could, I could be wrong because I didn't go back and re-read odetics, but I thought that that ruling was a ruling that pertained to the question of equivalency under 112.6, not under the traditional doctrine of equivalence. So, if I'm wrong about that, I will, I will take your word for it for now and check. I would, I'd like you to. Can you represent to me that you are confident that that is true and that you're not getting the two doctrines mixed up? No, I, I don't think so. You don't think, you can represent to me or you can't? I will represent to you, yes. In fact, if you go back to the pioneering doctrine of equivalence case, the Graber-Tank case, it dealt with with subsequent technology, you know, it's meant to prevent, it's meant to protect the patent owner from somebody who comes along and says, well, gee, I can do this a slightly different way and avoid the patent. That's, that's traditionally what the doctrine of equivalence is intended to protect the patent owner from subsequent technology and I think the courts for quite some time have recognized that the doctrine is simply not applicable to pre-existing technology. Well, there's the whole Wilson-Sporting Goods line of cases which talks about whether the, well, we won't get into that, it's a complex story, but I'm concerned that I'm concerned that odetics may be, and in fact, the judge cites odetics, I noticed, for the the 112-6 point. Not, I think, for the, but I may be wrong about that. In any event, did you have any other point you wanted to make? You mentioned trade dress. Do you want to speak briefly about that? Yes, I will. Do you, do you not want to continue, want me to continue with? We're running short of time. I think it probably makes sense to move on. Let's talk about trade dress. Again, let me give you a quick summary of our position on trade dress. In order to prove a cause of action on trade dress, product configuration trade dress, a plaintiff has to show that its trade dress is non-functional, that it's a part of secondary meaning, and there's likely to be consumer confusion between the plaintiff and defendant's products. In order to prove likelihood of confusion, we start out with that factor. The court applied so-called foundational factors from the Sleekgraff case in the Ninth Circuit. Sleekgraff says that the factors that you should consider are the strength of the plaintiff's mark, the proximity of the goods, the similarity of the marks, actual confusion, channels of trade, the types of goods, the care given by purchasers, the defendant's attendance selecting its mark, and the likely expansion of the party's product lines. Great Neck gave no response to these Sleekgraff factors. They spent their briefing time responding or refuting Starej's argument that the different word marks applied to the products were sufficient to distinguish them. Great Neck applied the trademark Sheffield to its mark, and Starej applied the mark Titan to its knife. And one of the arguments we put forward was that the use of those word marks should reduce or eliminate the likelihood of consumer confusion, and that's what Great Neck addressed in its brief. Not the Sleekgraff factors, as it should have. And we feel likely that they simply did not meet their burden on the trade dress infringement issue, and that alone should cause them to lose this case. Very well. We're over your time. So why don't we hear rebuttal from Mr. Previta? Your honors, the application of the law did not indicate that it had looked at the overall appearance. I do not see that in any of the opinion that the district court said. Furthermore, with respect to equivalency, you want to put any label on it, but equivalency is equivalency, and both in both infringement equivalency and 112 equivalency, it's a question of fact, which should be given to a jury, which the district court did not do. In the final analysis, all the plaintiff and the appellant wants is for the opportunity to go to a jury and put up and give them the facts and let the jury decide what the facts are. Thank you very much, your honors. Thank you. Very well, the case is submitted. We thank all counsel.